
# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# BIG STONE GAP DIVISION

| | |
|---|---|
| **PATRICIA J. WOODS,** | ) Civil Action No. 2:06cv00033 |
| Plaintiff, | ) |
| | ) **MEMORANDUM OPINION** |
| v. | ) |
| | ) |
| **MICHAEL J. ASTRUE,**[1] | ) By: GLEN M. WILLIAMS |
| **Commissioner of Social Security,** | ) SENIOR UNITED STATES DISTRICT JUDGE |
| Defendant. | ) |

In this social security case, the court affirms the final decision of the Commissioner denying benefits.

## I. Background and Standard of Review

Plaintiff, Patricia J. Woods, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 and § 1381 *et seq.* (West 2003 & Supp. 2006). This court has jurisdiction in this case pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3).

The court's review in this case is limited to determining if the factual findings

---

[1] Michael J. Astrue became the Commissioner of Social Security on February 12, 2007, and is, therefore, substituted for Jo Anne B. Barnhart as the defendant in this suit pursuant to Federal Rule of Civil Procedure 25(d)(1).

-1-

of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Woods first filed for DIB and SSI on March 18, 2002, alleging disability as of July 18, 2001, due to lupus, rheumatoid arthritis, degenerative disk disease and panic attacks. (R. at 31-32.) These claims were denied initially and upon reconsideration. (R. at 31.) A hearing was held before an administrative law judge, ("ALJ"), on June 23, 2003, and this claim was denied by decision dated July 7, 2003. (R. at 28-40.)

In denying this claim, the ALJ found that Woods was not disabled and found that Woods's "allegations regarding her limitations [were] not credible nor reliable." (R. at 39.) The ALJ stated that the record contained objective evidence of malingering by Woods. (R. at 35-38.) The ALJ noted that, despite her allegations, the record contained no medical evidence that Woods had ever been diagnosed or treated for lupus or rheumatoid arthritis. (R. at 37.) The ALJ stated that the record contained evidence that Woods's primary objective in seeking mental health treatment was to obtain Xanax. (R. at 37.) The ALJ found that the record documented a "very long history of very heavy alcohol abuse" and "the record

Case 2:06-cv-00033-GMW-PMS   Document 23   Filed 04/12/07   Page 2 of 33   Pageid#: 72

document[ed] that the claimant's primary mental impairment [was] related to substance abuse." (R. at 37.) Finally, the ALJ noted that the evidence in the record established that, absent Woods's substance abuse, she had no severe mental impairment. (R. at 36-39.) There is no evidence in the record that any further action was taken in this case following the ALJ's decision. Thus, as of July 7, 2003, Woods was not disabled without the consideration of her substance abuse problems. (R. at 39.)

The record shows that Woods protectively filed her current applications for DIB and SSI on July 10, 2003, alleging disability as of July 8, 2003, due to multiple traumas, lupus, rheumatoid arthritis, depression, back pain, hip pain, pelvic pain and shoulder pain. (R. at 16-17, 101, 104, 114, 704.) These claims were denied initially and upon reconsideration. (R. 47-51, 53-55, 709-11.) Woods then requested a hearing before an administrative law judge, ("ALJ"), which was held on July 28, 2005, at which Woods was represented by counsel. (R. at 720-53.)

By decision dated August 19, 2005, the ALJ denied Woods's claims. (R. at 13-23.) The ALJ found that Woods's substance abuse, bursitis and history of fractures were considered severe. (R. at 22.) The ALJ stated that none of Woods's impairments, aside from her substance abuse, met or medically equaled the requirements of any impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 22.) Woods's substance abuse, however, was found by the ALJ to be of the severity to meet the criteria of Section 12.09 of the listing of impairments. (R. at 22.) The ALJ stated that Woods's allegations regarding her limitations were not totally credible. (R. at 22.) The ALJ found that, absent her substance abuse, Woods had the

residual functional capacity, to perform light work[2] that precluded work around hazardous machinery or heights and did not require her to operate foot controls with her left foot. (R. at 22.) As a result, the ALJ found that Woods was unable to perform any of her past relevant work. (R. at 22.) Based on Woods's age, education, work experience, residual functional capacity and the testimony of a vocational expert, the ALJ concluded that Woods could perform jobs that existed in a significant number in the national economy, including those of a general office clerk, a non-postal mail sorter, a laborer, a gluer, a stapler, an assembler, an interviewer, an information clerk, a telephone answering service worker, a food cashier, a ticket clerk and a sales associate. (R. at 22.) The ALJ also concluded that the medical evidence established that Woods would not be disabled if she ceased her substance abuse. (R. at 23.) Therefore, the ALJ found that, in accordance with Public Law 104-121, enacted on March 29, 1996, Woods was not disabled in under the Act and was not eligible for benefits. (R. at 23.)

After the ALJ issued his decision, Woods pursued her administrative appeals. (R. at 12). The Appeals Council declined her request for review on May 5, 2006. (R. at 6-9.) Woods then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2006). The case is before this court on Woods's motion for summary judgment filed December 26, 2006, (Docket Item No. 19.), and on the Commissioner's motion for summary judgment filed January 18, 2007, (Docket Item No. 21).

---

[2] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can do light work, she also can do sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2006).

Case 2:06-cv-00033-GMW-PMS   Document 23   Filed 04/12/07   Page 4 of 33   Pageid#: 74

## II. Facts

In this case, the claimant has not challenged any of the Commissioner's findings with respect to her alleged physical impairments. (Plaintiff's Brief in Support of Motion for Summary Judgment, ("Plaintiff's Brief"), at 9-20.) As a result, the facts discussed in this opinion will focus on the claimant's alleged mental impairments and her history of substance abuse during the relevant time period, which the claimant has contested. (Plaintiff's Brief at 10-20.)

Woods was born in 1957 and was 48 years old at the time of the ALJ's decision. (R. at 16, 101, 104, 704.) Thus, pursuant to 20 C.F.R. §§ 404.1563, 416.963, Woods was considered a "younger individual" at the time of the ALJ's opinion. (R. at 22.) Woods received a high school education and special training as a certified nurse's assistant/licensed practical nurse.[3] (R. at 16, 120.) She had past relevant work experience in various nursing positions. (R. at 16-17, 115, 128-29, 747.)

At her hearing on July 28, 2005, Woods testified that she had not worked since July 2001. (R. at 725.) Woods stated that she enjoyed reading, but that it had become more difficult for her due to concentration problems. (R. at 726.) She indicated that she did light housework, but she mostly stayed to herself and rarely visited friends or

---

[3] At her hearing on July 28, 2005, Woods testified that she had received an associate's degree in nursing. (R. at 725.) However, in her disability report filed with the Social Security Administration, ("SSA"), Woods indicated that she received a general equivalency development diploma, ("GED"), and vocational training to become a Certified Nursing Assistant, ("CNA"), and a Licensed Practical Nurse, ("LPN"). (R. at 120.) She did not indicate that she received an associate's degree in her disability report. (R. at 120.)

-5-

relatives. (R. at 726.) Woods stated that she believed her most serious medical problems were her depression, her pain and that she had "a hard time with people." (R. at 727.)

With respect to her depression, Woods testified that she had been receiving counseling from the Lee County Counseling Center, ("LCCC"), since 2001. (R. at 728.) She indicated that the medication she was prescribed to deal with her symptoms made her lightheaded, it impacted her speech and it made her tired. (R. at 728.) She indicated that she was easily upset, and that she had crying spells. (R. at 729.) When asked about whether her medication for depression was working, Woods indicated that Wellbutrin was no longer having the desired result and, thus, her dosage was about to be altered. (R. at 731.) However, Woods did not indicate any problems with her other mental health medications. (R. at 731.)

Woods indicated that an abusive relationship with one of her ex-husbands was the reason she started counseling. (R. at 732.) She also stated that the counseling was helping. (R. at 732-33.) When questioned about her alcohol abuse, Woods testified that she had not consumed any alcohol in the last two-and-a-half or three years. (R. at 733.)

Dr. Susan Bland, M.D., a medical expert, testified at Woods's hearing. (R. at 734-38.) Dr. Bland reviewed Woods's medical records and she provided testimony at the hearing regarding Woods's physical impairments. (R. at 734-38.) Included in her discussion was a discussion about Woods's allegations that she had cancer and was receiving chemotherapy. (R. at 736.) Dr. Bland indicated that Woods had made

-6-

these claims to her therapist and her primary care physician.[4] (R. at 736.) Dr. Bland noted that there was no medical record of Woods having cancer. (R. at 736.) Instead, Dr. Bland stated that Woods was diagnosed with simple hyperplasia; as a result, she was treated for a few months with a very low dosage of hormones, which resolved the problem. (R. at 736.) Dr. Bland also noted that Woods had a history of domestic abuse, physical abuse and psychological issues. (R. at 736.)

After this discussion, Dr. Bland opined that none of Woods's physical conditions met or equaled a listing under the Act. (R. at 737.) Dr. Bland stated that she was giving Woods the benefit of the doubt when she found that Woods should be limited to lifting items weighing up to 20 pounds. (R. at 737-38.) Dr. Bland noted that Woods had occasional postural limitations on bending, stooping, squatting, crouching, crawling and kneeling. (R. at 738.) Due to Woods's medications, Dr. Bland advised against climbing ladders, working at unguarded heights, operating hazardous machinery and driving vehicles. (R. at 738.) She also indicated that Woods would be limited in her ability to push with her left, lower extremity. (R. at 738.)

Thomas Schacht, Ph.D., a licensed clinical psychologist, appeared and testified as a medical expert at Woods's hearing. (R. at 739-46.) Schacht indicated that Woods had a long history of mental health treatment for reactions to domestic abuse, reactions to the litigation aftermath of the abuse, reactions to other family related

---

[4] It also appears from the record that Woods alleged in her disability report that she had been diagnosed with uterine cancer and was awaiting treatment. (R. at 117.) This document was completed by Woods and signed under penalty of perjury on October 8, 2003. (R. at 117.) She also stated in a letter to the ALJ dated August 8, 2005, that she had been treated for a "cancerous biopsy." (R. at 93.)

issues and substance abuse. (R. at 740.) Schacht stated that Woods's substance abuse had been profound and persistent over time. (R. at 740.) Specifically, he noted that, in April 2002, Woods was found unconscious in her bed with a blood alcohol level of .400. (R. at 740.) At this time, Woods's son informed medical authorities that Woods had been drinking a case of beer daily and that she often expressed suicidal ideation when she was drinking. (R. at 740.)

After this episode, Schacht noted that Woods's medical records indicated that she continued to drink, and that she was treated at an alcohol rehabilitation facility in April 2002. (R. at 740.) Also following this episode, Woods was not trusted to take the Antabuse she was prescribed and she was often compelled to take this medication under supervision. (R. at 740.) As a result of the treatment, Schacht testified that Woods's mood greatly improved with sobriety. (R. at 740.)

Schacht further testified that, in spite of being on Antabuse, Woods continued to drink. (R. at 740.) He also noted that there were numerous inconsistencies concerning Woods's alcohol abuse in her medical records. (R. at 744.) He indicated that, in October 2002, she stopped taking Antabuse and quit attending Alcoholic's Anonymous meetings. (R. at 741.) Schacht noted that at some point Woods resumed drinking and, in June 2003, a temporary detention order by a sheriff indicated that she had been drinking. (R. at 741.) Later, in June 2003, her husband reported to the mental health center that Woods had been drinking heavily on a daily basis. (R. at 742.) Upon examination 10 days later, Woods claimed to have only used alcohol twice that year. (R. at 742.) As a result, the mental health center again compelled Woods to take Antabuse in their presence. (R. at 742.) However, in December 2003, reports from a neighbor to the LCCC indicated that Woods was drinking and driving.

-8-

(R. at 742.)

Additionally, Schacht testified that Woods had a history of other substance abuse problems and irregularities with her prescription medication. (R. at 741-44.) He noted that Woods had repeatedly attempted to receive additional Xanax before her prescriptions should have run out by repeatedly claiming that her medication had been stolen. (R. at 741, 743.) Schacht also noted that the record indicated, on more than one occasion, that Woods was receiving or attempting to receive overlapping prescriptions from different sources and that she had used a false name to receive additional prescription drugs. (R. at 741-43.)

Schacht further testified that, as a result of her behavior, efforts were made to monitor Woods for substance abuse and prescription drug abuse. (R. at 741.) These efforts included requiring pill counts for her medications, repeatedly requiring her to take Antabuse in the presence of mental health clinic staff and discussion of requiring drug testing; however, it was not clear if any drug testing was performed. (R. at 741-43.)

Schacht testified that following treatment, Woods's mental status evaluations were within normal limits. (R. at 742.) In December 2003, Woods's mental state remained within normal limits, and she requested that the mental health center remove the alcohol abuse diagnosis from her records. (R. at 742-43.) Reportedly, she stated that she had been sober for two years, and she claimed that this diagnosis was interfering with her attempts to receive DIB. (R. at 742-43.) At this time, her diagnosis was changed to "major depression in partial remission." (R. at 743.) By March 2004, her case manager reported that she was "'doing well, feeling great.'"

-9-

(R. at 743.) In August 2004, Schacht testified that descriptions of Woods were consistent with her diagnosis of depression in partial remission. (R. at 743.) Finally, he stated that this diagnosis continued through the end of her treatment records. (R. at 743.)

As a result, Schacht testified that the assessment in Woods's treatment records that her depression was in partial remission, should be accepted. (R. at 744.) He stated that the limitations placed on Woods based on this diagnosis "would probably be mild." (R. at 744.) With respect to her substance abuse, Schacht noted that there was a credibility question with regard to Woods's statements and that there were a lot of inconsistencies in the record that could not be resolved. (R. at 744.)

Cathy Sanders, a vocational expert, also testified at Woods's hearing. (R. at 746-52.) Sanders described Woods's past relevant work in various nursing positions as heavy[5] and skilled. (R. at 747.) She found that Woods had transferable skills to lighter subcategories of nursing work such as office nursing and public health nursing. (R. at 748.) The transferable skills were knowledge of nursing procedures, knowledge of drug administration, knowledge of drug side effects, knowledge of human vital signs record keeping and knowledge of medical equipment. (R. at 748.) Sanders was then asked a series of questions about a hypothetical individual with Woods's age, education, background and experience, who was limited physically as described at the hearing by Dr. Bland. (R. at 748.) Sanders stated that Dr. Bland had described an individual who could perform less than the full range of light work, with

---

[5] Heavy work involves lifting items weighing up to 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If someone can do heavy work, she also can do medium, light and sedentary work. *See* 20 C.F.R. §§ 404.1567(d), 416.967(d) (2006).

particular attention to lower extremity limitations, occasional postural limitations and limitations based on the impact of medications. (R. at 748-49.) Based on these limitations, Sanders found that the hypothetical individual could perform a significant number of jobs available in the regional and national economies, including that of a general office clerk, a non-postal mail sorter, a stapler, an assembler, an interviewer, an information clerk, a telephone answering service staffer, a food cashier, a ticket clerk and a sales associate. (R. at 749.)

The ALJ next asked Sanders to assume a hypothetical individual with the same physical residual functional capacity, but with the nonexertional limitations set forth in Exhibit B11F, the mental residual functional capacity assessment completed by Julie Jennings, a state agency psychologist. (R. at 749.) Sanders indicated Jennings's assessment placed moderate limitations on Woods in approximately 10 categories.[6] (R. at 750.) Sanders responded that, with these limitations, the hypothetical individual would not be able to perform the cashier positions, and 25 percent of the general labor market positions. (R. at 750.) These would be eliminated to accommodate the hypothetical individual's need for more flexibility in taking breaks

---

[6] These categories were the ability to understand and remember detailed instructions, the ability to carry out detailed instructions, the ability to maintain attention and concentration for extended periods, the ability to perform activities within a regular schedule, maintain regular attendance and be punctual within customary tolerances, the ability to sustain an ordinary routine without special supervision, the ability to work in coordination with or in proximity to others without being distracted by them, the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, the ability to interact appropriately with the public, the ability to accept instructions and respond appropriately to criticism from supervisors and the ability to set realistic goals or make plans independently of others. (R. at 565-66.) Jennings added that Woods had a moderate impairment, but that she could perform simple, unskilled, nonstressful work. (R. at 567.) She also noted that Woods's complaints were partially credible. (R. at 567.)

during the day, to eliminate the more stressful positions and to eliminate the positions with a higher demand for reliability. (R. at 750.) However, Sanders indicated that there were still a significant number of jobs in the regional and national economies, which the hypothetical individual could perform. (R. at 750.)

The final hypothetical presented to Sanders asked her to assume a hypothetical individual with the same age, education and relevant work experiences as the previous hypotheticals, along with the limitations described by Woods in her testimony. (R. at 750.) Sanders responded that there would be no jobs available to such a hypothetical individual. (R. at 750.) She further stated that, if Woods's testimony were accepted, it described an individual functioning at a "sub-sedentary" level, which would render the hypothetical individual unable to work in a competitive workforce. (R. at 750-51.)

In rendering his decision, the ALJ reviewed records from Dr. Christopher Morris, M.D.; Dr. Sue J. Prill, M.D.; Dr. Michael W. Bible, M.D.; LCCC; St. Charles Community Health Clinic/Stone Mountain Health Services; Lee Regional Medical Center; University of Virginia; Dr. Henry Scovern, M.D., a state agency physician; Dr. Aroon Suansilppongse, M.D., a state agency psychiatrist; Dr. Richard M. Surrusco, M.D., a state agency physician; July Jennings, Ph.D., a state agency psychologist, and Frontier Health.

The record in this case contains numerous medical records dating prior to the relevant time period at issue. A number of these records deal with Woods's alleged mental impairments and substance abuse prior to the relevant time period. These records indicate that beginning in 2001 Woods began visiting the LCCC and was

-12-

diagnosed with panic disorder with agoraphobia and depressive disorder, not otherwise specified. (R. at 328, 406.) Her diagnoses also included post traumatic stress disorder and a probable adjustment disorder with depressed mood. (R. at 397.) When she was placed on medication, Woods began to experience some improvement in her mood and a decrease in panic attacks. (R. at 391-92, 394.)

Woods's medical records document a pattern of substance abuse, including severe alcohol abuse. For example, Woods was hospitalized in relation to her alcohol abuse on December 29-30, 2001, April 9, 2002, and May 23, 2003. (R. at 353, 371, 433, 466, 470.) She claimed to have been treated briefly at the Laurels for alcohol abuse in April 2002, however, no record of that treatment was included in the record. (R. at 360.) Crisis calls related to Woods's drug and alcohol abuse were documented on May 1, 2002, May 2, 2002, May 10, 2002, and May 21, 2002. (R. at 359, 363, 376, 369.) Additionally, on one occasion, Woods's ex-husband, Ken, even was forced to break a car window to prevent Woods, who was drinking and driving at the time, from driving off of a ledge. (R. at 354-56.) On another occasion, Ken attempted to have Woods committed due to her alcohol abuse. (R. at 274-80.)

Ken and Woods's son, Dale, reported that Woods drank a case of beer a day when she moved in with them after leaving her abusive ex-husband. (R. at 371.) They stated that they were attempting to reduce her alcohol consumption; however, Woods would sneak and get more alcohol. (R. at 371.) Numerous other attempts were made to limit Woods's substance abuse. Ken and Dale also attempted to keep her medication locked up, they attempted to provide her with individual dosages of her medication and they supervised her taking Antabuse. (R. at 360-62, 371.)

-13-

In May 2002, Woods was placed on Antabuse and she was required to take this medication at the LCCC in the presence of medical staff. (R. at 360-61.) Based on this treatment, and her treatment with Xanax and Wellbutrin, Woods appeared to have ceased her substance abuse. (R. at 353.) Woods, herself, reported that she was thinking clearly and felt better than she had in a great while. (R. at 353.) In May and June 2002, Woods continued to maintain sobriety, she continued to comply with her treatment and she continued to properly take her medication. (R. at 349-52.) As a result of this compliance with treatment, Woods was found to be doing well and her mood had greatly improved. (R. at 349-52.)

However, after this month of dramatic improvement in her mental state induced by treatment and sobriety, she reported that she planned to celebrate by drinking beers on July 4, 2002. (R. at 349.) By July 2002, Woods had refused to comply with her doctor's suggestion that she attend Alcoholics Anonymous meetings and she denied having an alcohol problem. (R. at 345.) From July until November 2002, Woods's mood ranged from mildly anxious to moderately anxious with congruent affect. (R. at 316-25, 331-344.) In September, Ken reported that she was doing well and Woods noted that Wellbutrin was helping. (R. at 334-45.) Woods remained stable on her medications through November 2002. (R. at 334-45.) Aside from situationally stressful time periods which prompted alterations in her medication, Woods was reported, in January and February 2003, to be alert and oriented with a slightly anxious mood with affect. (R. at 296, 302-03.)

However, in January 2003, LCCC's records indicate that Woods's was no longer compliant with treatment sessions. (R. at 305.) By late March and April 2003, Woods began to complain of increased anxiety and depression. (R. at 289, 291.) In

-14-

June 2003, the record documented that Woods was abusing alcohol. (R. at 270, 274, 277.) Specifically, Ken reported that Woods was again drinking heavily on a daily basis and that he was unsure if she was taking her medication as prescribed. (R. at 270.) Also in June 2003, Woods's diagnosis was changed. (R. at 274.) At this time, Woods was no longer diagnosed with a panic disorder with agoraphobia and depressive disorder, instead she was diagnosed with alcohol dependence and personality disorder. (R. at 274.) Despite the evidence of her alcohol abuse and the change in her diagnosis, in July 2003, Woods claimed to have only abused alcohol twice that year. (R. at 268.)

The medical records prior to the relevant time period also suggest a problem with prescription drug abuse. For example, in February 2002, Woods claimed that a portion of her Xanax prescription was stolen and, thus, she was low on Xanax. (R. at 375.) Ken reported that he had to keep her medication locked up. (R. at 371.) In May 2002, Woods indicated that she considered overdosing on Xanax. (R. at 363.) By August 2002, limitations were put in place on the number of Xanax pills that were issued to Woods at one time. (R. at 336-38.) In January 2003, Woods admitted taking an average of four Xanax per day. (R. at 304.) In June 2003, Woods contacted LCCC requesting more Xanax when her current prescription should have lasted her an additional two weeks. (R. at 272.) The LCCC staff noted that throughout the conversation Woods's speech was slurred and "she easily lost her train of thought." (R. at 272.) After being denied additional Xanax, Woods then alleged that her medication had been stolen or that the pharmacy had incorrectly filled her prescription. (R. at 272.) Finally, it appears from the record that Woods had used different last names and different pharmacies to obtain early refills of Xanax. (R. at 271.)

-15-

Woods's medical records from the relevant time period begin on July 8, 2003. (R. at 266-68.) Woods saw Dr. Randall E. Pitone, M.D., at LCCC who noted that he had at least one report that Woods had been drinking. (R. at 266.) When confronted, Woods admitted to drinking and becoming intoxicated on Father's Day. (R. at 266.) Dr. Pitone noted that he did not want to prescribe Woods any benzodiazepines or any other medication with the potential for abuse. (R. at 266.) As a result, Dr. Pitone again placed Woods on Antabuse and required her to take this medication in front of LCCC staff before she would be given any prescription medication. (R. at 266-68.) Dr. Pitone also limited Woods's Xanax prescriptions to two-week intervals and made these prescriptions contingent upon continued use of Antabuse and proper pill counts. (R. at 266.) Additional records from July 8, 2003, from William R. Poe, B.S., a LCCC employee, indicated that Woods was diagnosed with alcohol dependence and a personality disorder. (R. at 268.) Poe also gave Woods a global assessment of functioning, ("GAF"), score of 50.[7] (R. at 268.)

The record contains several additional contacts with LCCC during July 2003.[8] (R. at 260-64.) However, it is clear that Woods reported that she was taking her medication as prescribed and that on July 21, 2003, her mood was euthymic and on July 29, 2003, her mood and affect were within normal limits. (R. at 260-62.) On

---

[7] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICS MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994). A GAF score of 41-50 indicates that the individual has "serious symptoms . . . OR serious impairments in social, occupational or school functioning." DSM-IV at 32.

[8] Due to the copy quality, many of Woods's records from the LCCC during the relevant time period are not entirely legible.

August 5, 2003, Woods saw Amanda L. Graham, B.S., at LCCC. (R. at 257, 259.) Graham indicated that Woods reported another instance where she became intoxicated; however, besides this incident, Graham reported that Woods was remaining sober. (R. at 259.) Graham diagnosed Woods with alcohol dependence, an anxiety disorder, not otherwise specified, and a personality disorder. (R. at 257.) Graham noted that Woods's mood and affect were within normal limits. (R. at 257.) Also on August 5, 2003, Dr. Pitone reported that Woods's mood was moderately anxious with some depression. (R. at 258.) However, Dr. Pitone noted that Woods was alert and oriented; he also noted that her affect was appropriate with good range, her speech was normal, her psychomotor activity was normal, her eye contact was good, her rapport was good and she appeared to be maintaining sobriety. (R. at 258.)

From August 6, 2003, until July 12, 2004, Woods's mood was described as euthymic or within normal limits, and improvement in her condition was noted with treatment and sobriety. (R. at 195, 203-07, 209-10, 214, 218, 220, 222, 226, 229, 235, 242, 245, 248-49, 254, 256, 630, 634, 664.) Woods reported being nervous because of medical problems from August 5 to October 8, 2003. (R. at 238, 240, 242, 245, 248, 254, 257.) On October 3, 2003, Woods stated to LCCC staff that she had been diagnosed with uterine cancer and would need to have surgery and chemotherapy.[9] (R. at 242.)

---

[9] While Woods claimed to have cancer, there is no medical evidence in the record to support this allegation. Furthermore, after numerous attempts in early 2004 by the Social Security Administration to contact Woods to obtain medical records of any cancer diagnosis or treatment, and after repeated contact with Woods's counsel to provide any such information, no information was ever provided. (R. at 47-48.) To date, this court is aware of no documentary evidence that has been provided to address this alleged diagnosis.

Dr. Pitone noted, on October 14, 2003, that Woods was moderately to severely anxious and moderately depressed, but her affect was appropriate with good range and she was otherwise normal. (R. at 236.) Also on October 14, 2003, Woods's mood and affect were documented to be within normal limits. (R. at 235.) Based on Woods's improvement and sobriety, she was once again given monthly prescriptions of Xanax. (R. at 236.)

From November 2003 through December 6, 2004, Woods repeatedly told LCCC staff that she was not feeling well due to chemotherapy and she continued to state that she had cancer. (R. at 190, 197, 200, 203-08, 210-11, 213, 218, 220, 227, 229, 233, 602-03, 607, 610, 612, 626, 629, 633, 651, 664, 668, 671-72.) As a result of her alleged reaction to chemotherapy, in November 2003, Woods was prescribed Halcion, a sleep aid; however, Dr. Pitone expressed some concern about dependency when it was prescribed. (R. at 227.) However, at a November 24, 2003, visit to LCCC Woods stated that she was "doing fine." (R. at 226.)

On December 3, 2003, a person called LCCC reporting to be Woods's neighbor and stated that she had heard from Woods's mother-in-law that Woods was drinking again and frequently driving drunk. (R. at 225.) She also reported that Woods was going to different medical facilities and using different names to obtain various prescription drugs. (R. at 225.) Dr. Pitone stated that he could not substantiate this report based on Woods's recent visits. (R. at 223.) He also noted that Woods had abused her prescription medications in the past, however, she appeared to now be using them properly and was benefitting from the treatment. (R. at 223.)

On December 9, 2003, Dr. Pitone noted that Woods's mood was moderately

-18-

depressed and moderately anxious, but that she was alert, oriented, calm, cooperative and had an appropriate affect with good range. (R. at 223.) Also upon examination on December 9, 2003, Woods's mood was documented as continuing to be within normal limits. (R. at 222.)

At a December 31, 2003, visit to LCCC, Woods reported to Graham that she had been sober for over two years. (R. at 220.) Woods also asked Graham to address her alcohol diagnosis because it was hampering her ability to obtain SSI and DIB benefits. (R. at 220.) Woods's mood and affect continued to be within normal limits. (R. at 220.)

Woods saw Graham on January 20, 2004, who reassessed her intake and treatment plan. (R. at 217, 673-700.) In this assessment, Graham diagnosed Woods with post traumatic stress, major depressive disorder, alcohol dependence and nicotine dependence. (R. at 673.) Woods was given a GAF score of 45. (R. at 673.) Graham noted that Woods was currently unemployed due to a disability, but that she had a poor work history due to substance abuse. (R. at 680.) Graham also noted that Woods demonstrated appropriate living skills, appropriate behavior, a positive support system, adequate transportation, adequate health care, adequate nutrition, suitable income and adequate housing. (R. at 680-82.) Finally, Graham noted that Woods did not demonstrate overt symptoms of her diagnosed depression and anxiety; she was maintained on psychiatric medications. (R. at 681.)

On March 3 and March 5, 2004, Woods reported she was in a good mood and that "she was doing well and feeling great." (R. at 209-10.) On March 8, 2004, Woods saw Dr. Zafar Ahsan, M.D., a psychiatrist with LCCC. (R. at 206-07.) Dr.

-19-

Ahsan reported that Woods had a "history of anxiety and depression in the past," she had done "favorably well on current medication" and that "[s]he did not offer any new complaints or concerns." (R. at 206.) Dr. Ahsan also noted that Woods had a history of alcohol dependence, but she claimed to have been sober for the past three years. (R. at 207.) Dr. Ahsan documented that Woods's mood was euphoric, her cognitive function was grossly intact, and her functional capacity had not been affected to any degree. (R. at 206-07.) As a result, he diagnosed Woods with major depression in partial remission, generalized anxiety disorder and post traumatic stress disorder. (R. at 207.) Woods was continued on her same medication and treatment. (R. at 207.)

Woods missed or canceled numerous appointments in the next several months. (R. at 191, 196-204, 631, 654, 657, 661, 670.) On May 26, 2004, Graham reported that Woods's mood and affect were within normal limits. (R. at 195, 664.) On a June 18, 2004, telephone call to LCCC, Woods reported that she felt depressed and that she had been having panic attacks due to the deaths of several friends and family difficulties. (R. at 189, 656.) Graham noted that Woods was oriented and alert and made no notation that her mood was abnormal. (R. at 189, 656.)

On June 28, 2004, Woods reported stress due to family problems, but her mood was found to be within normal limits. (R. at 634.) On July 2, 2004, a report was made to LCCC that Woods's prescriptions were called into Food City pharmacy, where she was not a client. (R. at 632.) On July 12, 2004, Dr. Ahsan reported that Woods appeared to be quite anxious. (R. at 628.) He noted that she continued to deal with usual and unusual stressors in her life that impacted her mood but that she was able to cope. (R. at 628.) She continued to be diagnosed with major depression in

partial remission, as well as an adjustment disorder and a generalized anxiety disorder. (R. at 628.) A past history of post traumatic stress disorder was noted. (R. at 628.) Also on July 12, 2004, Woods reported that someone had stolen all of her Xanax. (R. at 627.)

On July 30, 2004, Woods walked into the LCCC facility and requested prescriptions prior to the time that her medications were supposed to be refilled. (R. at 621.) When confronted, Woods claimed that her son must of stolen her medications, and she also complained of family problems. (R. at 621.) Regardless, her medications were not replaced. (R. at 621.) Her mood was noted to be depressed with congruent affect. (R. at 621.) On August 2, 2004, Woods telephoned LCCC and again complained of family problems and alleged that her ex-husband had beaten her. (R. at 620.) Her mood "sounded depressed" with congruent affect. (R. at 620.) At this time, Woods was provided prescriptions for her medication. (R. at 620.) On August 23, 2004, Woods claimed that her prescriptions had been reduced and that she was about to run out of Xanax. (R. at 617.) In an August 30, 2004, telephone call, Woods apparently "sounded depressed" and complained of anxiety related to family problems. (R. at 615.) However, by the next day, Woods reported that much of her family stress had lifted. (R. at 613.) Woods reported that she was having her Xanax refilled and she "sounded euthymic." (R. at 613.)

By September 29, 2004, Woods was again complaining that she was out of Xanax. (R. at 612.) In response, the LCCC staff indicated, once again, that Woods should not have been out of medication at that time if she were taking it properly. (R. at 612.) The following day Woods was still provided with additional medication. (R. at 611.)

Dr. Ahsan reported on October 4, 2004, that Woods's mood was anxious to depressed with a congruent affect. (R. at 607.) Dr. Ahsan found that her judgment and insight were good and fair respectively, and that her cognitive function was grossly intact. (R. at 607.) Dr. Ahsan noted that Woods continued to deal with a significant degree of family stressors. (R. at 607.) Woods continued to be diagnosed with major depression in partial remission and generalized anxiety disorder. (R. at 607.) Also on October 4, 2004, Woods's mood and affect were noted to be within normal limits. (R. at 610.)

On November 11, 2004, Woods reported that she was doing fairly well, but that she still had family problems. (R. at 603.) Woods noted that she was being required to undergo pill counts and drug testing through her primary care physician. (R. at 603.) Woods's mood and affect were found to be within normal limits. (R. at 603.) Also on November 11, 2004, Graham prepared a letter stating that Woods was in remission from her substance abuse issues, she had been sober for over a year and she had made progress with her depression. (R. at 187.) Graham also stated that Woods remained unable to work due to her mental health issues. (R. at 187.) Graham's letter did not include any objective medical evidence to support these assertions. (R. at 187.)

Woods saw Dr. Ahsan again on December 6, 2004, he opined that Woods had a mildly anxious mood with congruent affect. (R. at 651-52.) He also noted that Woods's cognitive function was grossly intact. (R. at 651.) Dr. Ahsan stated that Woods appeared to be dealing with a number of family and medical related stressors, but that she was "coping with [them] without any significant problems." (R. at 651.) She continued to be diagnosed with major depression in partial remission and

-22-

generalized anxiety disorder. (R. at 651.) On December 20, 2004, Woods telephoned LCCC complaining of difficulty in getting her Xanax prescription filled and reportedly sounded depressed. (R. at 601.)

Sharon Deel, RN, an employee of LCCC, reported that Woods's appeared to be clinically stable on January 18, 2005. (R. at 598.) She noted that Woods's mood was calm, mildly depressed and mildly anxious. (R. at 598.) On January 28, 2005, an assessment of Woods's need for services was completed, and while the record contains only part of this document, it does note that Woods only reported to have been sober since starting chemotherapy approximately six to eight months prior. (R. at 647.)

On February 22, 2005, Woods reported increased symptoms of depression due to increased pain and family problems. (R. at 597, 645.) While Deel reported that Woods's mood was moderately depressed, she noted that Woods's mood lifted somewhat after verbalizing concerns and feelings. (R. at 597.)

Dr. Ahsan reported on March 18, 2005, that Woods's cognitive function was grossly intact, her judgment and insight were good and her mood was anxious. (R. at 642.) Woods noted that she was having positive responses to her current medication and that she was able to cope with her anxiety related to testifying in court against her abusive ex-husband. (R. at 642.) At this appointment, Dr. Ahsan ruled out post traumatic stress disorder and continued to diagnose Woods with major depression in partial remission and generalized anxiety disorder. (R. at 642.)

Woods missed her case management appointments on April 13, 2005 and May

-23-

11, 2005. (R. at 638, 640.) In her final appointment with LCCC contained in the record, which occurred on May 23, 2005, Woods reported that she had been doing fair with no new psychiatric symptoms. (R. at 635.) Her mood was noted to be somewhat depressed with a blunted affect, but her interactions were described as friendly and appropriate. (R. at 635.) Deel discussed Woods's symptoms, medications, and levels of functioning with her and concluded that Woods appeared to be clinically stable. (R. at 635.)

Dr. Richard M. Surrusco, M.D., a state agency physician, examined Woods on July 15, 2004. (R. at 542-49.) Dr. Surrusco found that Woods had the residual functional capacity to occasionally lift and/or carry items weighing up to 20 pounds, to frequently lift and/or carry items weighing up to 10 pounds, to stand and/or walk for a total of about six hours in an eight-hour workday, to sit for a total of about six hours in an eight-hour workday and to push and/or pull to an unlimited degree. (R. at 543.) He stated that Woods should never climb using a rope or scaffold, but he found no manipulative, communicative or visual limitations. (R. at 545-46.) He found that she should avoid all exposure to fumes, odors, dusts, gases, poor ventilation and hazards. (R. at 547.) Dr. Surrusco also found that Woods should avoid concentrated exposure to extreme cold, heat, wetness, humidity, noise and vibration. (R. at 547.)

Additionally, Dr. Surrusco noted that the prior ALJ's decision found that "[s]ubstance abuse was a contributing factor material to the determination of disability." (R. at 544.) Dr. Surrusco espoused that "[m]edical evidence showed that the claimant would not be disabled without consideration of substance abuse." (R. at 544.) Finally, Dr. Surrusco noted that Woods's symptoms were not fully credible,

-24-

highlighting the fact that she was being treated for hyperplasia, not cancer. (R. at 548.) As a result, he found that the evidence did not support the limitations Woods described. (R. at 548.)

On July 15, 2004, Julie Jennings, Ph.D., a state agency psychologist, completed a psychiatric review technique form, ("PRTF"), evaluating Woods. (R. at 550-64A.) Jennings indicated that Woods suffered from an affective disorder, an anxiety-related disorder and a substance addiction disorder. (R. at 550.) Jennings elaborated that Woods suffered from depressive syndrome and anxiety brought on by recurrent recollections of a traumatic experience. (R. at 553, 555.) Jennings found moderate restrictions in Woods's activities of daily living, in her ability to maintain social functioning and in her ability to maintain concentration, persistence or pace. (R. at 560.) She found no episodes of decompensation. (R. at 560.) She noted that Woods's substance addiction disorders had resulted in behavioral changes or physical changes. (R. at 558.) However, she indicated that the substance abuse triggered her affective disorder and anxiety-related disorders, but these disorders were in remission. (R. at 558.) Additionally, Jennings stated that, despite Woods claim that she had been sober for three years, the record contained several instances during this period of alleged sobriety where she abused alcohol. (R. at 564.) She also noted that Woods's records during period of alleged sobriety documented improper usage of Xanax and attempts to obtain refills of her medication early and by using different names. (R. at 564.)

On July 15, 2004, Jennings assessed Woods's mental residual functional capacity. (R. at 565-67.) She opined that Woods was moderately limited in her ability to understand and remember detailed instructions, to carry out detailed

-25-

instructions, to maintain attention and concentration for extended periods, to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, to sustain an ordinary routine without special supervision, to work in coordination with or proximity to others without being distracted by them, to complete a normal workday and week without interruptions from psychologically based symptoms, to perform at a consistent pace without an unreasonable number and length of rest periods, to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors and to set realistic goals or make plans independently of others. (R. at 567-68.) However, she concluded that Woods was not significantly limited in her ability to remember locations and work-like procedures, to understand and remember very short and simple instructions, to carry out very short and simple instructions, to make simple work-related decisions, to ask simple questions or request assistance, to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness, to respond appropriately to changes in the work setting, to be aware of normal hazards and take appropriate precautions or to travel in unfamiliar places or use public transportation. (R. at 566.) Jennings noted that she considered Woods's symptoms to be partially credible. (R. at 567.) Finally, she stated that Woods had a moderate impairment that could limit her to simple, unskilled and non-stressful work. (R. at 567.)

### III. Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2006); *see also Heckler v. Campbell*,

-26-

461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920 (2006). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in the process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2006).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant maintains the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2), 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2006); *McLain v. Schweiker*, 715 F.2d 866, 868–69 (4th Cir. 1983); *Hall*, 658 F.2d at 264–65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated August 19, 2005, the ALJ denied Woods's claims. (R. at 13-23.) The ALJ found that Woods's substance abuse, bursitis and history of fractures were considered severe. (R. at 22.) The ALJ stated that none of Woods's impairments, aside from her substance abuse, met or medically equaled the requirements of any impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 22.) Woods's substance abuse, however, was found by the ALJ to be of the severity to meet the criteria of Section 12.09 of the listing of impairments. (R. at 22.)

The ALJ stated that Woods's allegations regarding her limitations were not totally credible. (R. at 22.) The ALJ found that, absent her substance abuse, Woods had the residual functional capacity, to perform light work that precluded work around hazardous machinery or heights and did not require her to operate foot controls with her left foot. (R. at 22.) As a result, the ALJ found that Woods was unable to perform any of her past relevant work. (R. at 22.) Based on Woods's age, education, work experience, residual functional capacity and the testimony of a vocational expert, the ALJ concluded that Woods could perform jobs that existed in a significant number in the national economy, including those of a general office clerk, a non-postal mail sorter, a laborer, a gluer, a stapler, an assembler, an interviewer, an information clerk, a telephone answering service worker, a food cashier, a ticket clerk and a sales associate. (R. at 22.) The ALJ also concluded that the medical evidence established that Woods would not be disabled if she ceased her substance abuse. (R. at 23.) Therefore, the ALJ found that, in accordance with Public Law 104-121, enacted on March 29, 1996, Woods was not disabled in under the Act and was not eligible for benefits. (R. at 23.)

In her brief, Woods argues that the ALJ erred in evaluating her mental impairment. (Plaintiff's Brief at 10-20.) More specifically, Woods argues that the ALJ's decision that, absent substance abuse, she does not have a severe mental impairment is not supported by substantial evidence. (Plaintiff's Brief at 10-11.) Woods does not contest the Commissioner's finding as to her physical residual functional capacity. Nor does she challenge the Commissioner's finding that she could perform the jobs identified, if her residual functional capacity were as found by the Commissioner.

-28-

The court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided that his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Woods argues that the ALJ erred in finding that, absent substance abuse, she does not have a severe mental impairment. (Plaintiff's Brief at 10-20.) Pursuant to a 1996 amendment, the Social Security Act provides that "[a]n individual shall not be considered to be disabled for purposes of this subchapter if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C.A. § 423(d)(2)(c) (West 2003 & Supp. 2006); 42 U.S.C.A. § 1382c(a)(3)(J) (West 2003 & Supp. 2006). The 1996 amendments specified that they were to "apply to any individual who applies for, or whose claim is finally adjudicated by the Commissioner of Social Security . . . on or after the date of the enactment of this Act." Pub. L. No. 104-121, §§ 105(a)(5)(A), 105(b)(5)(A), 110 Stat. 847, 853-54 (1996) (amending 42 U.S.C. §§ 405, 422, 423, 425 notes pertaining to DIB and amending 42 U.S.C. § 1382 notes pertaining to SSI).

Furthermore, the Social Security regulations provide that if it is found that a claimant is disabled and there is medical evidence of drug or alcohol abuse, this

-29-

evidence must be evaluated to determine if drug or alcohol abuse is a contributing factor material to the determination of disability. *See* 20 C.F.R. §§ 404.1535(a), 416.935(a) (2006). The "key factor" in making this determination is whether the claimant would still be disabled if she stopped using drugs or alcohol. 20 C.F.R. §§ 404.1535(b)(1), 416.935(b)(1) (2006).

Based on a review of the record, I find that substantial evidence exists to support the ALJ's determination that, absent substance abuse, Woods is not disabled. First, substantial documentary evidence in the record indicates that Woods's mental health symptoms were correlated with her substance abuse. The medical records prior to the relevant time period in this case demonstrate that, when Woods took her medication as prescribed, and she was able to stay sober, she experienced a dramatic improvement in her mental state. These records also document a correlation between Woods's drinking and her depression level.

This pattern was illustrated by the statements of Woods's ex-husband, Ken, and her son, Dale, who indicated that she was fine until she started drinking, but when she drank she became more depressed and suicidal. (R. at 359, 371.) This correlation was also documented by Woods's own statements when she was sober and complying with treatment. During a period of sobriety and compliance with treatment in the middle of 2002, Woods stated that she felt better and that she was doing better than she had been in a long time. (R. at 349-53.) Furthermore, the records indicate that when Woods complied with her recommended treatment and medication, it was helpful in controlling and reducing her anxiety as well. (R. at 334-45, 349-53, 372, 386, 389.) As a result, a finding was made in a prior ALJ opinion that, without her substance abuse, Woods did not have a severe mental impairment on or before July

-30-

7, 2003. (R. at 16-23.)

Substantial evidence exists in the record to demonstrate that this pattern continued during the relevant time period. In response to her substance abuse, in July 2003, Woods was placed on Antabuse and required to take this medication in front of LCCC staff and her prescriptions of Xanax were limited to two-week intervals. (R. at 266-68.) As a result, Woods began to report that she was taking her medication as prescribed and maintaining sobriety. During this period of alleged sobriety, Woods's mood was documented as being euthymic or within normal limits from August 2003 until July of 2004. (R. at 195, 203-07, 209-10, 214, 218, 220, 222, 226, 229, 235, 242, 245, 248-49, 254, 256, 630, 634, 664.) Also during this time period, Woods's diagnosis was changed by Dr. Ahsan, her treating psychiatrist, to indicate that her depression was in partial remission. (R. at 207.)

When the record begins to document abnormalities with Woods's use of prescription medication, and when Woods appeared to stray from her prescribed treatment, her mood was negatively impacted once again. In June 2004, the records begin documenting abnormalities with Woods's medication and on July 12, 2004, Woods reported that her medication had been stolen. (R. at 632, 627.) By the end of July, Woods was requesting prescriptions before they were supposed to have been refilled and again claimed that her medication had been stolen. (R. at 621.) In September 2004, Woods again claimed that she was out of medication, which the LCCC staff indicated should not have happened if she were taking it properly. (R. at 612.) During this time period, Woods's mood was occasionally documented as anxious and depressed. (R. at 607, 615, 621, 632.)

-31-

Based on these records, it is reasonable to assume that during this time period Woods was either abusing her prescription medication, or not complying with her treatment. However, once the record begins to document Woods's compliance with her treatment and no indications of substance abuse are present in the record, Woods again saw dramatic improvement in her mental state.

In November 2004, Woods reported that she was being required to undergo pill counts and drug testing by her primary care physician. (R. at 575, 603.) At this time, Woods's mood was again found to be within normal limits, she was found to be sober and Graham indicated that she had made progress with her depression. (R. at 187.) In December 2004, Dr. Ahsan stated that, despite dealing with a number family and medical stressors, Woods was found to be "coping with [them] without any significant problems." (R. at 651.) By March 18, 2005, Woods noted that she was having positive responses to treatment and that she was able to cope with her anxiety. (R. at 642.) At this appointment, Dr. Ahsan ruled out any post traumatic stress disorder and diagnosed Woods with major depression in partial remission and anxiety disorder. (R. at 642.) By her last appointment in May 2005, Woods reported no new psychiatric symptoms and she was found to be clinically stable. (R. at 635.)

Furthermore, Jennings, a state agency psychologist, noted that Woods's substance abuse had resulted in behavioral changes including affective disorders and anxiety related disorders, but that these disorders were now in remission. (R. at 558.) Jennings also noted that Woods's subjective complaints were found to be partially credible. (R. at 567.) Dr. Surrusco, a state agency physician, noted that Woods's symptoms were not fully credible and the medical evidence did not support the limitations she claimed. (R. at 548.) Schacht, a licensed clinical psychologist,

-32-

testified at Woods's hearing that, based on her medical records, her mental limitations would probably be in the mild range. (R. at 744.) Thus, substantial evidence in the record indicates that, when Woods took medication as prescribed and she was able to stay sober, she experienced dramatic improvement in her mental state and her mental state was documented as euthymic or within the normal range. As a result, this court finds that substantial evidence supports the ALJ's determination that, absent substance abuse, Woods did not have a significant mental impairment.

*V. Conclusion*

For the foregoing reasons, the Commissioner's motion for summary judgment will be sustained and the plaintiff's motion for summary judgment will be overruled. The final decision of the Commissioner denying benefits will be affirmed.

An appropriate order will be entered.

**DATED**:   This/24 day of April, 2007.

THE HONORABLE GLEN M. WILLIAMS
SENIOR UNITED STATES DISTRICT JUDGE

-33-